IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

CHARLENE LEHMAN,                )
                               )
                 Plaintiff,    )
                               )
v.                             )        No. 2:07-CV-022
                               )
MICHAEL J. ASTRUE,             )
Commissioner of Social Security, )
                               )
                 Defendant.    )

## MEMORANDUM OPINION

This is an action for judicial review, pursuant to 42 U.S.C. § 405(g), of

defendant Commissioner's final decision denying plaintiff's claim for disability insurance

benefits under Title II of the Social Security Act. For the reasons provided herein,

defendant's motion for summary judgment [doc. 14] will be granted, and plaintiff's motion

for summary judgment [doc. 11] will be denied. The final decision of the Commissioner will

be affirmed.[1]

---

[1] In what is becoming a common occurrence, plaintiff's attorneys filed a brief of more than twenty-five pages [doc. 12] without seeking prior approval from the court. *See* E.D. TN. LR. 7.1(b) (Briefs "*shall not* exceed 25 pages in length unless otherwise ordered by the court.") (emphasis added). Counsel is cautioned that any such unapproved future filings may be stricken from the docket.

# I.

## *Procedural History*

Plaintiff applied for benefits in November 2002, claiming to be disabled by constant pain which prevents her from "walk[ing] or sit[ting] or stand[ing] very long . . .[,] lift[ing] anything . . . [or] walk[ing] without crutches." [Tr. 58, 67]. She alleged a disability onset date of May 27, 2000, secondary to an on-the-job fall. [Tr. 58, 81]. Plaintiff's claim was denied initially and on reconsideration. She then requested a hearing, which took place before an Administrative Law Judge ("ALJ") on June 15 and November 18, 2004.

In November 2004, the ALJ issued a decision denying benefits. He concluded that plaintiff suffers from sacroiliac pain, borderline intellect, and right piriformis syndrome, but that these conditions did not meet or equal any impairment listed by the Commissioner. [Tr. 22, 28]. The ALJ found plaintiff's allegations to be "not totally credible." [Tr. 31]. Citing vocational expert testimony, the ALJ concluded that plaintiff retained the residual functional capacity ("RFC") to perform a significant number of sedentary jobs existing in the regional and national economies. [Tr. 30-31]. Plaintiff was accordingly deemed ineligible for benefits.

Plaintiff then sought review from the Commissioner's Appeals Council. Review was denied on December 14, 2006. [Tr. 2, 8]. The ALJ's ruling therefore became the Commissioner's final decision. *See* 20 C.F.R. § 404.981. Through her timely complaint, plaintiff has properly brought her case before this court. *See* 42 U.S.C. § 405(g).

## II.

### *Background*

Plaintiff was born in 1971.  [Tr. 58].  She has an eleventh grade education and a GED.  [Tr. 472].  Her previous employment is as a nursing assistant, clothing sorter, and fast food worker.  [Tr. 68].

Plaintiff stands less than five feet tall and weighs as much as 216 pounds.  [Tr. 340, 399].  She is reportedly able to do only minimal shopping, driving, and housework.  [Tr. 82, 92-94, 99].  Plaintiff states that she cannot ambulate without canes, crutches, or a walker due to extreme pain and the likelihood of falling.  [Tr. 470].  She further contends that her "shoulders and arms and hands are not very good from using my crutches for so long[.]"  [Tr. 47].  She uses her computer an hour or two per day, and she crochets.  [Tr. 259, 379].

## III.

### *Relevant Medical Evidence*

#### A. <u>Physical</u>

Plaintiff was treated by Dr. David Kern on June 1, 2000.  Plaintiff reported a May 27 on-the-job fall in which "she fell off a stair onto an adjacent radiator.  She landed on her left buttock and immediately felt a pain in the local area."  [Tr. 129].  Dr. Kern noted that "[w]ith great effort she made her way onto the examination table by climbing onto her stomach and then rolling over onto her side."  [Tr. 129].  Dr. Kern conducted a partial examination which was largely unremarkable.  He was unable to complete the examination

because when he tried to touch plaintiff on her buttocks or thighs, "she almost jumped off the table. . . . The patient's response seemed rather exaggerated." [Tr. 129]. Dr. Kern diagnosed an acute contusion of the left buttock along with possible sciatic nerve trauma. He prescribed physical therapy. [Tr. 130]. At her initial therapy appointment, she was described as possibly "a bit hyper sensitive to her pain[.]" [Tr. 233].

Plaintiff returned to Dr. Kern's office, on crutches, one week later. [Tr. 126]. Examination showed tenderness to touch in the buttocks and hypersensitivity in the medial calf. [Tr. 126]. Dr. Kern opined, "For now, she will remain out of work. Her need to use crutches and inability to sit would make light duty essentially impossible." [Tr. 127]. The previous two days, however, her physical therapist described her as "much improved" and he saw "nothing clinically wrong." [Tr. 231]. The following week, the therapist wrote that plaintiff was improved "but still has a long way to go." [Tr. 227]. Shortly thereafter, plaintiff reported an exacerbation of pain secondary to taking her children to the beach. [Tr. 225].

On June 21, 2000, the physical therapist expressed his agreement with the purported assessment of Dr. Robert Furman that plaintiff was suffering from piriformis syndrome. [Tr. 223].[2] Plaintiff returned to Dr. Kern on June 22, 2000. He wrote, "She will

---

[2]

Piriformis syndrome is a rare neuromuscular disorder that occurs when the piriformis muscle compresses or irritates the sciatic nerve - the largest nerve in the body. The piriformis is a narrow muscle located in the buttocks. Compression of the sciatic

(continued...)

remain out of work at this time" based on plaintiff's report that Dr. Furman "has recommended that she remain out of work for 2 weeks." [Tr. 125].[3]

At a June 30, 2000 therapy appointment, plaintiff reported increased pain likely due to lack of the medication Flexeril, which she "stopped taking . . . because I ran out and I don't have much money to get new." [Tr. 218].[4] At a July 5 appointment with Dr. Kern, plaintiff limped, walked with a cane, and preferred not to sit because of discomfort. [Tr. 123]. Dr. Kern wrote a prescription for a cane and noted that, "She will remain out of work at this time per [Dr. Furman's] recommendation." [Tr. 123]. Dr. Kern continued to observe tenderness to light touch in the lower buttocks, but "[t]his palpation is light enough that it should not be putting any pressure on the sciatic nerve directly." [Tr. 123].

---

[2](...continued)
nerve causes pain - frequently described as tingling or numbness - in the buttocks and along the nerve, often down to the leg. The pain may worsen as a result of sitting for a long period of time, climbing stairs, walking, or running

. . .

The prognosis for most individuals with piriformis syndrome is good. Once symptoms of the disorder are addressed, individuals can usually resume their normal activities.

*See* http://www.ninds.nih.gov/disorders/piriformis_syndrome/piriformis_syndrome.htm (last visited Dec. 20, 2007).

[3] Although the administrative record suggests that plaintiff may have seen Dr. Furman during this time period [Tr. 186], there is no actual documentation that Dr. Furman treated her between June 22, 1999, and August 25, 2000. [Tr. 186-89].

[4] The administrative record indicates that plaintiff is, however, able to afford at least one pack of cigarettes per day. [Tr. 291, 340, 344, 358, 379, 407].

On July 26 and 28, 2000, the physical therapists planned to "wean[] her off her crutch" and initiate "more aggressive" exercise, noting that plaintiff "should be able to handle it comfortably." [Tr. 207].[5] Plaintiff, however, took a break from physical therapy to go on a one week vacation. [Tr. 207].

On August 7, 2000, plaintiff told her therapists, "I'm certainly much better" but that Dr. Furman "says I shouldn't go back to work until I'm much better." [Tr. 206].[6] The therapists noted that plaintiff was not "in real good shape" but was "much improved" and that her piriformis muscle was "stretching out beautifully." [Tr. 206].

On August 25, 2000, the therapists wrote that "we're getting fairly close to" releasing plaintiff to return to work. [Tr. 201]. That same day, Dr. Furman wrote, "Patient is definitely better. She thinks she is '75% better.' . . . We'll let her return to work 4 hours a day, 3 days a week in the light duty job. Advance one hour per day every week and then slowly go from 3 to 5 days a week." [Tr. 186]. Plaintiff returned to work but soon reported increased left leg pain, deemed possibly due to driving to customers' homes and "getting in and out of the car so much." [Tr. 199].

One month later, plaintiff told her therapists that she had decided against having an injection, even though "everyone else wants me to have it[.]" [Tr. 192]. The

---

[5] Six weeks later, despite plaintiff's complaints of increasing leg pain, the therapists again noted "the need to get her out in the gym and get her working more physically trying to improve her general fitness as well as just her back problem." [Tr. 197].

[6] Dr. Furman's records do not confirm this statement.

therapists were "disappointed [because they thought] it is her best bet to get better." [Tr. 192]. The therapists opined that there was "still a long ways to go to get back to work." [Tr. 192].

On October 25, 2000, Dr. Furman wrote that plaintiff "is not doing well at all" due to complaints of pain, numbness, and tingling. [Tr. 183]. He opined that plaintiff currently was unable to work due to reported discomfort caused by sitting or standing. [Tr. 183].

In November 2000, plaintiff consulted with pain specialist Jonathan Herland. She complained of continuous left buttock and left leg pain since her on-the-job fall. [Tr. 239]. Dr. Herland's review of lumbosacral MRIs showed only slight abnormalities. [Tr. 239]. Plaintiff was termed "exquisitely sensitive" to double straight-leg raise testing and palpation over the left sacroiliac joint. [Tr. 240]. There was also a positive piriformis test for pain radiating into the left leg. [Tr. 240]. Dr. Herland diagnosed piriformis syndrome and recommended sacroiliac and piriformis injections. [Tr. 240-41].

Plaintiff received a sacroiliac injection near the beginning of 2001. Three weeks later, she told Dr. Herland that the injection had been beneficial but that her pain still "increases throughout the day with her usual activities to the point where in the evening it is still very bothersome." [Tr. 238]. Dr. Herland opined that plaintiff would more likely tolerate light duty work than her traditional nursing duties "which are quite demanding." [Tr. 238]. On February 9, 2001, Dr. Furman noted that plaintiff "does not want to return to Dr.

Herland[.]"  [Tr. 182].

Dr. Furman opined that plaintiff could return to light duty work "within the limits of her comfort." [Tr. 182].  He further opined that plaintiff's "problem is due to her left [sacroiliac] joint." [Tr. 182].  However, on subsequent x-rays Dr. Furman described both sacroiliac joints as appearing "entirely normal." [Tr. 182].

Plaintiff returned to Dr. Herland in July 2001 for a second injection but reported that the treatment did not provide lasting relief.  [Tr. 236].  At a September 7, 2001 appointment, Dr. Kern noted a limp, use of two canes, mild tenderness at the LS spine, and more tenderness in the left buttock. [Tr. 119].  He wrote that Dr. Furman had retired and "her care was transferred to Dr. Howard Jones in Stockton Springs.  Apparently he saw her on several occasions but has now apparently refused to continue seeing her or prescribe any medication for her." [Tr. 119].[7]  The following month, Dr. Kern recorded a diagnosis of "[c]hronic pain syndrome with somewhat inconsistent findings," stating, "I really have little in the sense of what this woman's problem is at this point." [Tr. 116-17].  Plaintiff continued to report sharp pain and limped with the use of two canes.  [Tr. 116].

Three weeks later, Dr. Kern noted "the absence of objective abnormalities, despite a multitude of tests." [Tr. 114].  He had received records from an insurance company (presumably plaintiff's workers' compensation provider).  Dr. Kern wrote, "In a note of

---

[7]  Curiously, it appears that plaintiff did not provide Dr. Jones's name to the Commissioner as a potential source of medical records. [Tr. 69-72, 76].  His file is therefore not a part of the administrative record in this case.

Sept. 10th, an evaluating physician wrote . . . to report that his opinion has changed in light of a video tape which reportedly showed [plaintiff] shopping, moving freely without the use of her canes, walking fluidly, and entering her car and driving without difficulty." [Tr. 113]. Dr. Kern commented that this raised questions as to the veracity of plaintiff's complaints, although "on the other hand the patient has never claimed weakness, just pain, worse with weightbearing activity." [Tr. 113].

In November 2001, plaintiff told Dr. Kern that she had recently experienced improvement from physical therapy "but this has no longer been the case of late. She believes that perhaps the loss of persistent improvement might be attributable to the fact that she is moving . . . and as a result had to do a lot of packing and lifting[.]" [Tr. 111].

On November 26, 2001, plaintiff consulted with rehabilitation specialist Dr. G.T. Caldwell. Plaintiff reported daily, unimproved left buttock and leg pain along with left foot numbness. [Tr. 253]. On examination, plaintiff was "clearly . . . overweight and deconditioned." [Tr. 254]. Pain resulted from stretching the piriformis or from palpation of the left buttock. [Tr. 254]. The left sacroiliac joint and the buttocks were "quite sensitive to touch." [Tr. 254]. Dr. Caldwell diagnosed piriformis syndrome and was "not very optimistic about the future." [Tr. 254]. He opined, "Working sedentary to light duty capacity two to four hours per day would be reasonable, and then we could build up time from that point." [Tr. 255]. Dr. Caldwell did not want to make further treatment recommendations until he had reviewed insurance company videotapes and until plaintiff had "respond[ed] to

me directly" regarding that evidence. [Tr. 255].

On December 7, 2001, Dr. Caldwell reviewed the available evidence and assigned a five percent whole body impairment, noting the absence of "clear objective evidence of pathology[.]" [Tr. 251-52]. He "believe[d] that she does have a work capacity, but that she should not return to work that involves heavy lifting and other forceful activity." [Tr. 251].

At an appointment later that month, plaintiff told Dr. Caldwell that she is unable to lose weight and that she cannot tolerate walking due to pain. [Tr. 250]. Dr. Caldwell

> told her that there is not much I have to offer her. It is up to her to start walking and losing weight and to get strong. It has been more than a year and a half since the injury, and the actual pathology is minimal. This is more of a functional problem. If she is motivated and wants to lose weight and exercise, then that is up to her. I encouraged her to get involved in a pool program, and I wrote out a prescription for that. I cannot make her swim or make her do the exercises that she knows she needs to do. She feels she cannot do them because of pain, and I do not have any power to break that pattern.
>
> . . . based on her past history I do not see that there is a lot of hope for change in the future, and the issue of her pain problem is basically up to her and not to a treating physician. I do not have much more to offer.

[Tr. 250]. Regarding plaintiff's request for a disability license plate, Dr. Caldwell responded, "I believe that you do not qualify for the disability plates according to their criteria. I am aware that you use a cane, but I do not think that you are incapable of walking without a cane. Therefore, I did not send in the form and am returning it to you." [Tr. 249].

In February 2002, plaintiff complained to Dr. Tara Nolan that her right forearm hurts due to the use of her canes. [Tr. 259]. Dr. Nolan described plaintiff as "not a terribly active person." Dr. Nolan referred plaintiff to physical therapy to determine whether plaintiff was overusing, and/or using inappropriately, her canes and crutches. [Tr. 259]. Physical therapist Sue Phillips opined that "the elbow pain will continue unless we are able to help her ambulate without assistive devices." [Tr. 278].[8]

At her next appointment with Dr. Nolan, plaintiff reported that her right arm pain had resolved, but that she was now experiencing left forearm and shoulder pain due to cane/crutch use. [Tr. 258]. Dr. Nolan opined, "She is unable given her multiple complaints to pursue employment at this time." [Tr. 258]. At an April 2002 appointment, plaintiff continued to report arm pain secondary to cane use. [Tr. 257]. She acknowledged being told that cane use was "optional," but claimed severe back pain when she walks independently. [Tr. 257]. Dr. Nolan

> asked if she would like to see her physiatrist, Dr. Caldwell, and she tells me that she would prefer to see a different provider as she states there was some issue of her being videotaped in a parking lot for disability and Dr. Caldwell in her words 'not getting along with her after that'. [sic] In any event, her symptoms seem to wax and wane, certainly better now that she is not using the canes quite as much. From her past medical records, I can not see where it was ever indicated that she must use her canes at all times.

[Tr. 257].

---

[8] Conversely, in September 2002, Ms. Phillips opined that plaintiff "requires the crutches due to the pain in her hip." [Tr. 265].

Because she no longer wished to see Dr. Caldwell, plaintiff was instead referred for a rehabilitation consultation with Dr. Alan Ross. Plaintiff's goal was "better use of her hands" due to numbness "which she felt was related to walking with two canes." [Tr. 290]. Plaintiff complained of 8/10 pain and exhibited "pronounced pain behavior" such as "saying ouch" and "muttering phrases like 'there's a lot of pain.'" [Tr. 291]. After examination, Dr. Ross "[a]greed with Dr. Caldwell that there is a significant functional component." [Tr. 291]. He wanted to review additional medical records but opined that plaintiff could "work two hours a day, three days a week with no two consecutive days, with a commute of 15 minutes or less, lifting up to 5 pounds and changing from sit[ting] to standing at will. She may occasionally walk." [Tr. 291-92].

By August 2002, Dr. Ross had obtained and reviewed the workers' compensation video, reporting that

> [r]egarding the video, she stated on another visit with me that she was not even sure it was her in the video because the image was so small. The video shows her walking briskly out of a supermarket using two canes and lower[ing] herself into her car on her left leg. Today, she stated it was her in the video, but that she got a shot from Dr. Herland in June or July [2001] which was helping her at the time. She also stated "I do have good days and I have always told my doctors this." The dates of the video were July 31, 2001, August 2, 2001, October 9, 2001, and October 17, 2001.

[Tr. 285].[9] Dr. Ross then surreptitiously observed plaintiff walking to her car after the appointment that day. He concluded that her abilities demonstrated in the examination room

---

[9] However, as noted above, plaintiff told Dr. Herland on July 25 (six days *before* the first filming) that his injections had *not* provided her any lasting relief. [Tr. 236-37].

were "very different" than those shown on the video and on her walk to her car. [Tr. 285-86]. Based on his observations, Dr. Ross declined plaintiff's request for a forearm crutches prescription. [Tr. 286]. Dr. Ross further noted plaintiff's report that she had not scheduled a pain psychology appointment, as he had "ordered," due to cost. [Tr. 286].[10] He opined, "At some point, *when she is motivated to improve*, I feel that working with pain psychology would be worthwhile." [Tr. 286] (emphasis added). Dr. Ross "releas[ed] her to work four hours a day, five days a week, sitting up to 60 minute durations and standing and walking occasional short distances. She may lift up to five pounds. She may drive up to 60 minute durations." [Tr. 286].

Dr. Ross ordered a functional capacity evaluation ("FCE"). The evaluator deemed the FCE results to be valid and plaintiff was described as cooperative yet very deconditioned. [Tr. 293, 299]. The majority of the physical tests were terminated upon plaintiff's complaints of pain and/or inability to move. [Tr. 296-99].

In September 2002, plaintiff had a surgical consultation with Dr. Julie Long. Spinal examination revealed some tenderness. [Tr. 303]. Hip examination was "not completely consistent with piriformis" syndrome. [Tr. 303]. Review of bone scans and MRIs showed mild abnormalities. [Tr. 303-04]. Surgery was not recommended. Dr. Long instead urged aquatic therapy, weight loss, smoking cessation, and "getting away from the dependency on 2 crutches[.]" [Tr. 304].

---

[10] *See* footnote 4.

On October 3, 2002, after reviewing the FCE, Dr. Ross amended his August 2002 vocational opinion only slightly. [Tr. 283]. He further

> advised her that I have seen inconsistencies in what she can do on physical exam and what she does functionally, and therefore, I felt that she needed to push herself to increase her functional level. . . .
>
> It is medically necessary that she begin a health club membership for an active pool exercise program[.] . . . It will be extremely important that she build up her endurance and fitness *which will eventually allow her to work full-time*."

[Tr. 283] (emphasis added).

Two months later, plaintiff returned to Dr. Ross with complaints of sacroiliac and shoulder pain. Shoulder examination revealed a mild impingement which was not deemed severe enough to warrant an injection. Citing cost concerns, plaintiff had not begun aquatic exercise as recommended. [Tr. 282].[11] Dr. Ross again opined that plaintiff should work only part-time.

At a January 2003 appointment with Dr. Nolan, plaintiff continued to report shoulder, neck, and arm pain. [Tr. 256]. In Dr. Nolan's opinion, these complaints were "all related to the patient's use of the crutches." [Tr. 256]. Plaintiff purportedly had "continued to try and get in for water therapy and swimming, but can not afford the gym." [Tr. 256].[12] Dr. Nolan again referred her for physical therapy. [Tr. 261]. The therapist observed pain and tenderness. [Tr. 261]. Plaintiff attended one or two sessions, left for a two week vacation,

---

[11] *See* footnote 4.

[12] *See* footnote 4.

and apparently did not return for further therapy resulting in her discharge due to noncompliance. [Tr. 260-61].

Nonexamining physician Iver Nielson generated a Physical RFC Assessment in March 2003. Dr. Nielson opined that plaintiff could work full-time at the light level of exertion, with no ability to climb ladders, ropes, or scaffolds and with limited exposure to hazards and vibrations. [Tr. 321-28]. In June 2003, another state agency physician (name illegible) generated a similar Physical RFC Assessment, but without predicted limitations regarding hazards or vibrations. [Tr. 329-36].

Dr. Jose Velasco began treating plaintiff in September 2003. In addition to back pain, plaintiff complained of pain and spasms in the hands, arms, and shoulders due to bilateral cane overuse. [Tr. 344]. Dr. Velasco described her as "[n]ot exercising and trying to get her disability at this time." [Tr. 344]. Plaintiff was obese, ambulatory, limping, and did not appear to be in distress. [Tr. 344-45]. Sacroiliac tenderness was noted. [Tr. 345]. At a February 2004 appointment, plaintiff questioned whether it would be safe to receive another sacroiliac injection since she suspected that she might be pregnant. [Tr. 340-41]. At an April 2004 appointment, plaintiff continued to complain of shoulder, arm and hand problems "worse when us[ing] the crutches." [Tr. 337].

In October 2003, nurse Benjamin Meeks noted full range of motion but "significant" lumbar and sacroiliac tenderness. [Tr. 359]. He commented, "She is disabled." [Tr. 358]. In November 2003, Dr. Turney Williams also noted tenderness at the left

sacroiliac joint. [Tr. 360]. In March 2004, physical therapist Rebecca Greene observed "significant" piriformis tenderness and symptoms worsened by use of bilateral crutches. [Tr. 366, 375]. Ms. Greene wrote that plaintiff "is disabled." [Tr. 366]. In May 2004, plaintiff was using a four-pronged walker and was preparing to travel from Tennessee to Maine for a daughter's surgery. [Tr. 398].

Dr. Karl Konrad performed a physical consultative examination in July 2004. Dr. Konrad wrote, "I do not believe that I received full cooperation from this client during her exam." [Tr. 399]. Pelvic, hip, and shoulder x-rays were normal, plaintiff could change positions with no or minimal difficulty, and Dr. Konrad noted an "exaggerated" and "questionable" limp. [Tr. 400-01]. Based on his objective findings [Tr. 399-401], Dr. Konrad predicted that plaintiff could work full-time at all levels of exertion with only occasional postural restrictions. [Tr. 402-04].

May 2004 rheumatoid testing results were not consistent with rheumatoid arthritis. [Tr. 417]. In July and August 2004, rheumatologist William Wason opined that it was "unlikely that she has an inflammatory arthritis." [Tr. 425, 429]. Following an August 2004 appointment, Dr. Velasco's nurse practitioner noted that plaintiff was extremely tender to palpation "anywhere" that she was touched. [Tr. 416]. In October 2004, plaintiff continued to complain of chronic shoulder and back pain. [Tr. 415]. X-rays were taken the following day. Her bilateral shoulder x-ray was "normal," and lumbar x-rays showed "mild slippage" and degenerative arthritis. [Tr. 421-22].

In 2004, plaintiff also complained of mild hand pain. [Tr. 429]. Dr. Wason suggested a nerve conduction study for carpal tunnel syndrome [Tr. 436], but plaintiff refused. [Tr. 417, 436].

## B. Mental

In October 2001, physician Kern diagnosed "[d]epression, responsive to Amitriptyline." [Tr. 117]. Psychologist Kathryn Smith performed a mental status evaluation in July 2004. Plaintiff "walk[ed] very slowly with a walker" and had lines on her face which Dr. Smith deemed "consistent with dealing with chronic pain for a duration of time." [Tr. 407]. Dr. Smith diagnosed borderline intellectual functioning and "[m]ood disorder due to chronic pain with major depressive features." [Tr. 410]. Citing pain and depression, Dr. Smith's narrative predicted occasional or "some degree of" difficulty with concentration, persistence, mood, attendance, and adaptation to workplace stressors. [Tr. 410]. In a separate form assessment, Dr. Smith predicted "seriously limited but not precluded" abilities in almost all categories, citing depression and borderline intelligence. [Tr. 412-13]. Among these categories were use of judgment and dealing with the public, even though Dr. Smith's narrative described plaintiff as exhibiting good judgment [Tr. 407] and as being a "people person" [Tr. 408].

## C. Post-Hearing Evidence

Plaintiff submitted twenty-one pages of additional medical records to the Appeals Council. [Tr. 12, 445-65]. She has not, however, briefed this evidence relative to

sentence six of 42 U.S.C. § 405(g). The evidence has accordingly not been considered by this court. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993).

IV.

*Vocational Expert Testimony*

Vocational expert Norman Hankins ("Dr. Hankins" or "VE") testified at plaintiff's administrative hearing. The ALJ presented a hypothetical claimant with limited education, borderline intellect and "a mood disorder due to chronic pain with major depressive features." The hypothetical claimant would be capable of performing the full range of sedentary work. [Tr. 481].

In response, Dr. Hankins listed jobs existing in the state and national economies that the hypothetical claimant could perform. [Tr. 482]. If Dr. Smith's mental form assessment were credited, all employment would be precluded. [Tr. 482]. The same would be true if the hypothetical claimant needed to use a walker or if excessive naps or absences were required. [Tr. 482-83].

V.

*Applicable Legal Standards*

This court's review is confined to whether the ALJ applied the correct legal standards and whether his factual findings were supported by substantial evidence. 42 U.S.C. § 405(g)*; Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial

evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). Nonetheless, the court must take care not to "abdicate [its] conventional judicial function," despite the narrow scope of review. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 490 (1951).

A claimant is entitled to disability insurance payments under the Social Security Act if she (1) is insured for disability insurance benefits, (2) has not attained retirement age, (3) has filed an application for disability insurance benefits, and (4) is under a disability. 42 U.S.C. § 423(a)(1). "Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423 (d)(2)(A). Disability is evaluated pursuant to a five-step analysis summarized by the Sixth Circuit as follows:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters*, 127 F.3d at 529 (citing 20 C.F.R. § 404.1520). Plaintiffs bear the burden of proof at the first four steps. *See Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five. *See id.*

## VI.

### *Analysis*

Plaintiff argues that the ALJ failed to properly weigh her mental impairments, bilateral hand impairments, and obesity. She further contends that "[i]n reaching his RFC determination, the ALJ . . . rejected the opinions of every physician who has treated or examined Plaintiff and . . . substituted his own opinion." The court will address these

theories in turn after first discussing the pivotal issue of plaintiff's credibility.

## A. Credibility

The ALJ concluded that plaintiff's "allegations regarding her limitations are not totally credible[.]" [Tr. 29, 31]. In support of his conclusion, the ALJ noted:

1. The minimal objective evidence supporting plaintiff's complaints.

2. Plaintiff's ability to relocate on multiple occasions and to take vacations.

3. Dr. Caldwell's opinion that plaintiff does not need a cane.

4. Plaintiff's refusal to exercise as instructed by her physicians, or to try to lose weight.

5. The inconsistencies in plaintiff's mobility when she is being watched versus when she thinks she is not being watched.

6. The minimal effort and exaggerated limp described by Dr. Konrad.

7. Plaintiff's activity level.

8. Her recent remarriage.

9. Her inconsistent participation in physical therapy.

Cumulatively, these facts provide substantial evidence through which a factfinder could conclude that plaintiff's complaints are exaggerated. Particularly striking is plaintiff's refusal to participate in aquatic exercise - due to alleged financial restrictions (which somehow do not impact her ability to afford one or more packs of cigarettes per day) - even though Dr. Ross has told her that a successful commitment to exercise would enable her to return to full-time work. Also striking are plaintiff's choices (and ability) to go on

vacations rather than attending prescribed physical therapy.  [Tr. 207, 260-61].

The record unquestionably contains substantial evidence to support the conclusion that plaintiff has refused to meaningfully participate in her own health care.  The administrative record, viewed as a whole, is utterly inconsistent with that of a person who suffers from the limitations alleged.  *See Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 480 (6th Cir. 1988).  The court stresses that this observation is not relevant merely to plaintiff's failure to lose weight.  *See, e.g., Harris v. Heckler*, 756 F.2d 431, 435-36 n.2 (6th Cir. 1985) ("The [Commissioner] is certainly not entitled to presumptions that obesity is remediable or that an individual's failure to lose weight is 'wilful'. [sic]  The notion that all fat people are self-indulgent souls who eat more than anyone ought appears to be no more than the baseless prejudice of the intolerant svelte.") (citation omitted).  Instead, this evidence speaks to plaintiff's apparent failure to ever genuinely *attempt* to lose weight or exercise, even after Dr. Ross told her that doing so would allow her to return to full-time work.

> The Social Security Act did not repeal the principle of individual responsibility.  Each of us faces myriads of choices in life, and the choices we make, whether we like it or not, have consequences.  If the claimant in this case chooses to drive [her]self to an early grave, that is [her] privilege – but if [she] is not truly disabled, [she] has no right to require those who pay social security taxes to help underwrite the cost of [her] ride.

*Sias.*, 861 F.2d at 480.

Certainly, the ALJ *could have* credited plaintiff's subjective complaints in this case.  However, he could also have reasonably rejected them based on the present record.

The substantial evidence standard of review permits that "zone of choice." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). Further,

> after listening to what [plaintiff] said on the witness stand, observing [her] demeanor, and evaluating that testimony in light of what appears in the written medical records, the ALJ concluded, rightly or wrongly, that [plaintiff] was trying to make [her] symptoms and functional limitations sound more severe than they actually were. It is the ALJ's job to make precisely that kind of judgment. It is a difficult job, and the people who perform it sometimes err. Such errors are obviously difficult for a reviewing court to detect (the reviewing court not having seen the claimant in the flesh), and we will not normally substitute our impressions on the veracity of a witness for those of the trier of fact. ***We would be particularly reluctant to do so in this case, where there seem to be demonstrable discrepancies between what the claimant said on the stand and what the written record shows***.

*Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987) (emphasis added).

### B. Mental Impairments

Plaintiff argues that the ALJ did not adequately consider her alleged depression and the restrictions predicted by evaluating psychologist Smith. The court disagrees. The ALJ restricted plaintiff to unskilled work. [Tr. 29]. In his hypothetical, the ALJ presented Dr. Hankins with a claimant who had borderline intellect and "a mood disorder due to chronic pain with major depressive features[.]" [Tr. 481]. To the extent that the ALJ did not adopt Dr. Smith's restrictive second opinion, that opinion was inconsistent with her earlier assessment and, as noted by the ALJ [Tr. 28], was largely based on plaintiff's subjective complaints, which this court and the ALJ have deemed unreliable at best.

## C. Upper Extremity Impairments

Next, plaintiff contends that the ALJ did not adequately consider her complaints of upper extremity pain and numbness. This argument, too, is unavailing.

Plaintiff cites the opinions of a Dr. Samuel Scott, a vocational counselor, and a physician's assistant pertaining to repetitive activity and lifting. However, these assessments were offered two to three years prior to the alleged disability onset date [Tr. 133, 165, 170] and are inconsistent with the more recent opinions of Dr. Ross, Dr. Konrad, and the functional capacity evaluator, who all opined that plaintiff can use her arms continuously [Tr. 283, 295, 403].

Although the record contains a suggestion of the presence of carpal tunnel syndrome, plaintiff refused testing to confirm the presence of that condition. [Tr. 417, 436]. Lastly, although the record contains an abundance of subjective complaints pertaining to the upper extremities, plaintiff has repeatedly related those complaints to her overuse of canes and crutches. As correctly noted by the ALJ [Tr. 28], there is substantial evidence to support the conclusion that plaintiff does not need these assistive devices. [Tr. 249, 257].

## D. Obesity

Plaintiff next argues that the ALJ did not consider impact of her obesity, but she specifies no additional restrictions caused by this condition. The argument is therefore deemed waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997). Further, the ALJ did acknowledge plaintiff's obesity and correctly observed that no physician had

predicted any associated restrictions.  [Tr. 27].

E. Physician Opinions

Lastly, plaintiff claims that "the ALJ has rejected the opinions of every physician who has treated or examined Plaintiff and has again substituted his own opinion." Specifically, plaintiff complains that the ALJ did not adopt the assessments of the functional capacity evaluator, Drs. Kern, Furman, Nolan, Long, and Ross, and the file-reviewing physicians.

The FCE was ordered by Dr. Ross.  The physical therapist who performed the evaluation deemed the results valid.  [Tr. 293, 300].  However, because the majority of tests were terminated upon plaintiff's subjective complaints [Tr. 296-99], the ALJ reasonably dismissed the evaluation due to plaintiff's limited credibility and poor effort. [Tr. 27].

Plaintiff next cites the opinions of treating physician Kern.  In June 2000, Dr. Kern wrote that plaintiff was unable to work due to the purported inability to sit and the need to use crutches. [Tr. 127].  In November 2001, Dr. Kern wrote that plaintiff had "no work capacity."  [Tr. 112].  However, a statement that a claimant has "no work capacity" is akin to terming a claimant "disabled," and that ultimate issue is reserved to the Commissioner, not the treating physician. 20 C.F.R. § 416.927(e)(1).  Further, the overall credibility issues and minimal objective evidence noted by the ALJ justify the dismissal of Dr. Kern's opinions. As already observed, there is substantial evidence that plaintiff does not need crutches. Moreover, Dr. Kern performed examinations that were largely unremarkable [Tr. 123, 129];

25

he described plaintiff's responses as "rather exaggerated" [Tr. 129]; he observed "somewhat inconsistent findings" and had "little in the sense of what this woman's problem is" [Tr. 116-17]; he noted "the absence of objective abnormalities, despite a multitude of tests" [Tr. 114]; and he subsequently questioned plaintiff's credibility in light of the videotape evidence. [Tr. 113-14]. Lastly, Dr. Kern's "no work capacity" statement was accompanied by no examination "in that physical evaluation has not revealed findings contributing to understanding the patient's problem." [Tr. 111].

Plaintiff next complains of the rejection of Dr. Furman's assessments. To the extent that plaintiff relies on Dr. Furman's checking of "no work capacity" on workers' compensation forms [Tr. 177-78, 180], that is, again, an ultimate conclusion reserved to the Commissioner. The ALJ further explained that Dr. Furman's assessments were more extreme than his treatment records would support. [Tr. 27]. For example, Dr. Furman's ultimate opinion in February 2001 was that plaintiff could return to light duty work "within the limits of her comfort" and that her "problem is due to her left [sacroiliac] joint." [Tr. 182]. However, later that day, Dr. Furman described both sacroiliac joints as appearing "entirely normal" on x-rays. [Tr. 182].

Plaintiff next complains that the ALJ did not adopt Dr. Nolan's statement that "[s]he is unable given her multiple complaints to pursue employment at this time." [Tr. 258]. The ALJ correctly disregarded Dr. Nolan's opinion as "clearly based on the claimant's subjective complaints and not on the objective evidence in the record." [Tr. 27]. The court

further notes that on multiple occasions Dr. Nolan related plaintiff's complaints to the overuse of assistive walking devices. [Tr. 256-57].

Plaintiff next complains that the ALJ did not adopt the opinion of Dr. Long who, following a single surgical consultation, checked the "no work capacity" box on a workers' compensation form. [Tr. 306]. Again, this is an ultimate issue reserved to the Commissioner. Further, Dr. Long's extreme opinion is inconsistent with her objective findings. Particularly, review of bone scans and MRIs showed only mild abnormalities. [Tr. 303-04]. Also, Dr. Long's assessment appears to have been influenced by plaintiff's suspicious subjective complaints, such as being "very dependent" on bilateral canes and crutches [Tr. 302] and being unable to afford aquatic exercise (which had admittedly been "the most helpful"). [Tr. 301].

Plaintiff next cites the four opinions by Dr. Ross, each of which restricted her to only part-time work. The ALJ validly explained that the opinions were rejected because the latter two were based on the FCE testing. As noted above, a reasonable factfinder could conclude that the FCE was invalid due to the unreliability of plaintiff's subjective complaints. The court further notes that Dr. Ross's first opinion was generated prior to his review of the insurance videotape and his observation of plaintiff walking to her car. Further, Dr. Ross stated that "there is a significant functional component" to plaintiff's circumstance [Tr. 291]; he received dubious explanations from plaintiff regarding the videotape [Tr. 285, 236-37]; he observed that plaintiff's abilities demonstrated in the

examination room were "very different" than those shown on the video and on her walk to her car [Tr. 285-86, 283]; he suggested that she could improve if motivated to do so [Tr. 286]; and he stated that proper exercise (which plaintiff refused to do) "will eventually allow her to work full-time." [Tr. 283]. Reading Dr. Ross's records as a whole, the ALJ's decision remains supported by substantial evidence.

Lastly, plaintiff complains that the ALJ did not adopt the climbing and hazards restrictions predicted by the file-reviewing physicians. Plaintiff does not complain, however, that the ALJ restricted her to sedentary work even though the file-reviewers opined that she was capable of light work. This conflict characterizes the unenviable task with which the ALJ was presented - synthesizing a wealth of opinions, a dearth of objective evidence, and a complainant who could reasonably be deemed unreliable.

Despite plaintiff's arguments to the contrary, the record does contain opinion evidence consistent with the ALJ's conclusions. Pain specialist Dr. Herland suggested that plaintiff could tolerate "light duty" work. [Tr. 238]. Despite initially being "not very optimistic" [Tr. 254], rehabilitation specialist Dr. Caldwell noted the absence of "clear objective evidence of pathology" and "believe[d] that she does have a work capacity, but that she should not return to work that involves heavy lifting and other forceful activity." [Tr. 251-52]. Notably, Dr. Caldwell told plaintiff that her case is primarily functional and motivational, and that he "cannot make her swim or make her do the exercises that she knows she needs to do." [Tr. 250]. Lastly, examining consultant Dr. Konrad suspected malingering,

found virtually no supporting objective evidence, and predicted that plaintiff could work full-time at all levels of exertion with only occasional postural restrictions.  [Tr. 399-404].

In sum, the administrative record contains some objective indications of tenderness and mild skeletal problems.  It does not, however, contain sufficient objective documentation as to render the ALJ's decision unsupported by substantial evidence.  The final decision of the Commissioner will accordingly be affirmed.  An order consistent with this opinion will be entered.

ENTER:


        s/ Leon Jordan
        United States District Judge